**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.   5:16-CR-4096-LTS |
| Plaintiff, | |
| vs. | **REPORT AND RECOMMENDATION** |
| ALAUNA GAYE MORRIS, | |
| Defendant. | |

_____

*I.*      *INTRODUCTION*.............................................................. 2

*II.*     *PROCEDURAL HISTORY* ............................................... 3

*III.*    *RELEVANT FACTS* ......................................................... 4

    *A.*    *Clay County Sheriff's Office Impound and Inventory Policies* .................. 4

    *B.*    *Defendant's Arrest and the Impound of the RV* .................................. 7

    *C.*    *Available Driver to Move the RV*..................................................... 12

    *D.*    *Inventory Search of the RV* ........................................................... 12

*IV.*    *DISCUSSION*................................................................. 14

    *A.*    *Lawful Vehicle Impoundment* ....................................................... 15

    *B.*    *The Decision to Impound Defendant's RV*....................................... 17

    *C.*    *Lawful Inventory Searches* ........................................................... 20

    *D.*    *The Inventory Search of the RV* .................................................... 22

*V.*     *CONCLUSION*............................................................... 23

## I. INTRODUCTION

The grand jury charged the Defendant, Alauna Gaye Morris, in a three-count indictment with drug-trafficking offenses from 2015 through September 14, 2016. Doc. 2.[1] These charges stem, in part, from the seizure of drugs and paraphernalia during a search of Defendant's recreational vehicle (RV) on September 8, 2016, and during later searches of the RV and Defendant's residence. Defendant challenges the impoundment and inventory search of her RV on September 8, 2016. Doc. 11. She moves to suppress all evidence obtained during the inventory search and subsequent searches pursuant to a search warrant. Doc. 11. The United States (the government) resists Defendant's motion. Doc. 12. On January 17, 2017, I held a hearing on the motion. Doc. 17. The parties later filed the exhibits admitted during the hearing following the hearing.[2] Doc. 17, 18, 19.

For the reasons explained below, I respectfully recommend that the court **deny** Defendant's motion to suppress.

---

[1] "Doc." refers to the criminal docket in this case. "MJ Doc." refers to the docket in the predecessor case in 16-MJ-274. Each is followed by the number corresponding to the docket entry. "Exhibit" and "Ex." refers to the exhibits, followed by exhibit number and time on the recording, admitted during the suppression hearing on January 17, 2017.

[2] I admitted Exhibit B, which consists of two videos and one audio recording, into evidence without objection during the motion hearing on January 17, 2017. The United States, with the agreement of the parties and pursuant to my order, submitted Exhibit B to the court following the hearing. Due to technical difficulties, I was not able to review this exhibit until February 2, 2017. It appears from my review that Exhibit B(1) is a video from Deputy Schueller's body camera, that Exhibit B(2) is a video from Deputy Schueller's patrol vehicle, and that Exhibit B(3) is an audio recording from inside Deputy Taylor's patrol vehicle.

2

## II.     PROCEDURAL HISTORY

On November 1, 2016, the government charged Defendant by criminal complaint with one count of conspiracy to distribute a controlled substance.    MJ Doc. 1. Defendant made her initial appearance before this court on November 3, 2016.    MJ Doc. 6.    On November 16, 2016, the grand jury returned an indictment charging Defendant with conspiracy to distribute methamphetamine from 2015 until September 9, 2016 (Count 1), and possession with intent to distribute methamphetamine on September 9, 2016 (Count 2), and on September 14, 2016 (Count 3).    Doc. 2.    The court originally scheduled trial for January 3, 2017.    Doc. 6.    On December 12, 2016, the court granted Defendant's motion and continued trial to February 6, 2017.    Doc. 10. On December 16, 2016, Defendant filed the motion to suppress.    Doc. 11.    The Government filed a resistance to the motion on December 22, 2016.    Doc. 12.    Based on the filing of this motion, the court granted Defendant's second and unresisted motion to continue trial and scheduled trial for March 6, 2017.    Doc. 14.    During a status conference on February 3, 2017, the court granted Defendant's third and unresisted motion to continue based on the pending motion to suppress.    Doc. 22.    Trial is now scheduled for the two-week setting that begins on April 3, 2017.    Doc. 23.

At the motion hearing on January 17, 2017, the government presented testimony from Clay County (Iowa) Sheriff's Office Deputy Spencer Taylor.    Defendant presented testimony from Defendant's husband, Joseph Walter Morris.    The government offered Exhibit 1 (Clay County Sheriff's Office Impound Policy) and Exhibit 2 (vehicle impound record for Defendant's RV on September 8, 2016).    Defendant offered Exhibit A (state arrest warrant from September 7, 2016), Exhibit B (three videos of the traffic stop), and Exhibit C (Morris's Driver's Daily Log dated September 8, 2016).    I sustained

3

Defendant's objection to the admission of Exhibit 1. I admitted the remaining exhibits into evidence.

## III. RELEVANT FACTS[3]

### A. Clay County Sheriff's Office Impound and Inventory Policies

Deputy Taylor[4] has been a deputy with the Clay County Sheriff's Office (sheriff's office) since approximately 2012. He testified he was familiar with the impound and inventory policy and practices of the sheriff's office. As part of his duties as a patrol deputy, he impounds vehicles several times per week. The sheriff's office issued a written impound policy on August 1, 2015. According to Deputy Taylor, that policy was a written adaptation of the unwritten practices used by the sheriff's office prior to that time. The written policy provided[5] four instances when a deputy may impound a vehicle: the vehicle was abandoned; the vehicle had been involved in an accident; the vehicle's driver had been arrested; or the vehicle posed a hazard. The policy and practice for the sheriff's office was to tow vehicles when they posed a hazard or when the sole occupant had been arrested. Deputy Taylor testified that the impound policy

---

[3] The relevant facts contained in this section came from the Affidavit submitted in support of the criminal complaint (MJ Doc. 1), Defendant's Brief in Support of Motion to Suppress (Doc. 11-1), the government's Brief in Opposition to Defendant's Motion to Suppress (Doc. 12), testimony presented during the suppression hearing, and the recordings contained in Exhibit B from the suppression hearing. Times listed in this factual summary are approximate.

[4] Deputy Taylor received a degree in criminal justice from Iowa State University and graduated with the 243rd class of the Iowa Law Enforcement Academy. He testified his duties with the sheriff's office included conducting routine patrol, responding to complaints, executing warrants, and preventing crime.

[5] The actual written policy was not admitted into evidence. Deputy Taylor testified to what the policy provided. Based on my observations, it appeared that Deputy Taylor read from the policy when he stated the four circumstances in which a vehicle could be impounded.

4

was also consistent with the goal of preventing liability for the sheriff's office.    Liability could arise if a vehicle that deputies did not impound were to be struck, vandalized, or broken into.

In regard to the driver's arrest provision of the policy, deputies are allowed to release the vehicle, rather than have it impounded, if there is a licensed driver available, and the vehicle was properly registered and insured.    It is unclear from the record what, if anything, the policy says about what constitutes an "available" driver.    Deputy Taylor testified that in practice, "available" means the licensed driver was present at the scene. Deputies generally impound vehicles when there is no licensed and insured driver at the scene.    On cross-examination, Deputy Taylor agreed with defense counsel that "at the scene" was not in the written policy.    Deputy Taylor testified that it was not standard practice to allow arrestees to contact someone to respond to the scene to drive the vehicle. Based on his experience, arrestees often lied and said a driver could respond to the scene quickly, and then deputies ended up waiting for a long period before the other driver actually arrived.    Deputy Taylor said that in his experience, arrestees did this because they preferred not having their vehicles towed and impounded.    He testified that deputies avoid trying to wait long periods for another driver to arrive and move the vehicle.

Deputies do not tow every vehicle that falls under one of the policy's four categories.    Deputy Taylor testified that they could exercise discretion under the policy. He said this was because it was hard to predict factors that may be present in any given situation.    It appears the policy allows deputies to exercise discretion in deciding whether a vehicle was abandoned or posed a hazard, and whether another driver was available. According to Deputy Taylor, whether a vehicle was impounded "depends on the circumstances."    For instance, when the driver is arrested for driving offenses (such as driving while barred), the vehicle will "almost assuredly" be impounded.    As another

5

example, vehicles involved in accidents would usually be towed, although Deputy Taylor could not say definitively that this happened every time. He testified that "more often than not" in circumstances in which the driver was arrested and there were property concerns (the type of circumstances present in this case), the vehicle was impounded. Deputy Taylor testified that "by more often than not," he meant there were "outliers" when a vehicle in those circumstances would not be impounded. There are situations when vehicles that could be impounded are left on the side of the road. Deputy Taylor reiterated that the policy provided for impounding vehicles when the driver was arrested or the vehicle posed a hazard.

Deputy Taylor described that the standard procedure when a vehicle was towed was to contact a towing company in Spencer, Iowa. The towing company then took the vehicle to the sheriff's office if directed to do so. Deputy Taylor later testified on cross-examination that towed vehicles were generally taken to the towing service's lot. Under the sheriff's office policy, deputies are required to inventory items that could be valued at more than $25.00. These items are recorded on an impound report that contains a description of the vehicle, the operator, the owner, the reason for the tow, the towing service, and a list of items inventoried. Ex. 2. It is not clear what the policy says, if anything, about when and where the inventory search is to occur. Deputy Taylor testified that it is standard for deputies to inventory vehicles prior to impound. They always do so if the vehicle was to be towed to the tow service's lot rather than the sheriff's office secure impound lot. According to Deputy Taylor, one or two deputies generally conducted inventory searches. The policy directed deputies to stop the search if it was unreasonable to proceed. Nothing in the policy addressed searching inside containers. The practice, according to Deputy Taylor, was to look inside a container if it might contain something worth more than $25.00.

### B.    Defendant's Arrest and the Impound of the RV

In March 2016, law enforcement in Clay County, Iowa, received information from a person in jail that Defendant was involved in distributing methamphetamine.    On September 7, 2016, Deputy Casey Timmer with the sheriff's office conducted surveillance at Defendant's rural Spencer residence in Clay County.    After seeing vehicles coming and going from the residence, Deputy Timmer requested assistance with the surveillance.    Two other deputies, including Deputy Taylor, responded and helped with the surveillance.    Deputies conducted surveillance for approximately one to one and a half hours, during which time they saw multiple vehicles visit Defendant's residence.    They believed those vehicles belonged to or were driven by persons associated with the use or distribution of methamphetamine, some with prior drug-related arrests.    The same day, the Palo Alto County (Iowa) Clerk's Office issued a warrant for Defendant's arrest for false reporting of a financial transaction (Exhibit A).    Exhibit A contains a stamp "Received IA State Patrol Comm" with an apparent time of "12:20." Deputy Taylor did not know the facts of the underlying charge but did not dispute that the alleged false report occurred in January 2016.

The following day, September 8, 2016, Deputy Taylor learned of the Palo Alto County arrest warrant when Deputy Timmer showed it to him.    It was common practice, according to Deputy Taylor, for deputies to discuss active warrants or persons of interest. In addition to being aware of the historical information about Defendant distributing methamphetamine and the prior day's surveillance, Deputy Taylor had previously encountered Defendant and knew what she looked like.[6]    After learning about the arrest warrant, Deputy Taylor testified he "went about [his] business," which included handling

---

[6] Deputy Taylor identified Defendant in the courtroom during the suppression hearing.

7

complaints and other duties.   He denied driving by Defendant's residence multiple times that day.

Late that afternoon, around 4:20 p.m., Deputy Taylor drove past Defendant's residence on 350th Street, which is the same street on which the sheriff's office is located. He saw an RV coming down the driveway as he drove past.   While he saw the driver had long hair,[7] Deputy Taylor was not able to identify the driver.   Deputy Taylor believed the driver might have been Defendant, who he knew had an active arrest warrant.   Deputy Taylor turned around, drove by the RV, turned around again, and then followed the RV.   There was a car in between the RV and Deputy Taylor's vehicle. He was not able to tell how many people were inside the RV.   After the other car turned off, Deputy Taylor conducted a license plate check and learned that the RV was registered to Defendant.   At 4:29 p.m., Deputy Taylor initiated a traffic stop of the RV on 350th Street, approximately seven miles from Defendant's residence.   Defendant was the sole occupant and the driver of the RV.   Exhibit 2(B) shows Defendant's vehicle to be a midsize RV.

Deputy Taylor described 350th Street, also known as B-24, as a county black top. There were no streetlights and no residences in the area.   It was not a high-crime area. While the road had some hills, Exhibit B(2) shows the area near the traffic stop to be relatively flat.   Morris, Defendant's husband, testified he often saw vehicles parked on the side of that road.   During the traffic stop, Defendant stopped the RV on the shoulder of the road.   The RV was off the roadway, with its tires outside the fog line.   Deputy Taylor had no real concerns with the way Defendant had parked her vehicle.   Exhibit B(2) shows the midsize RV parked across from a T-intersection (to the left of and across

---

[7] Based on my observations during the suppression hearing, Defendant has long hair.

350th Street from the RV) and beside a street sign (to the right of the RV). On cross-examination, Deputy Taylor agreed that Defendant parked on the only space available on 350th Street. He also said that it was unlikely that other vehicles would have struck the RV with it parked there. Nevertheless, Deputy Taylor testified that based on his training as a traffic officer, any obstacle could pose a hazard.

During the traffic stop, Deputy Taylor confirmed the Palo Alto arrest warrant. He had Defendant exit her vehicle, handcuffed and arrested her on that warrant, and placed her in the backseat of a patrol vehicle. Deputy Taylor provided Defendant her *Miranda* warnings at 4:41 p.m. (Exhibit B(1), 0:10), while she was in the backseat of the patrol vehicle. Deputy Schueller had arrived by that point to assist Deputy Taylor.[8] After Deputy Taylor provided Defendant's *Miranda* warnings, they engaged in a brief conversation, mainly about the Palo Alto County charges underlying Defendant's arrest. Just prior to Deputy Taylor closing the door of the patrol vehicle (he was outside the vehicle), Defendant said she could secure her property and something about a tow. Ex. 2B. Deputy Schueller then asked Deputy Taylor if he was going to request a tow. At that point, approximately one minute and twenty seconds after the *Miranda* warnings, Deputy Taylor requested a vehicle to tow the RV for impound. Ex. B(1), B(3).

The impound record listed the "reason for impoundment" as "arrest." Ex. 2. Deputy Taylor acknowledged he could have exercised discretion and allowed Defendant, as she requested, to secure the vehicle rather than having it towed. He did not do so. Deputy Taylor testified that his decision to impound the RV was within the policy and practice of the sheriff's office. During re-cross-examination, Deputy Taylor answered

---

[8] It is not clear from the evidence, including Exhibit B, when Deputy Schueller actually arrived. Exhibit B(1) is a video that appears to be from Deputy Schueller's body camera and begins just before Deputy Taylor provides Defendant with her *Miranda* warnings.

"correct" to defense counsel's repeated questions that Deputy Taylor exercised discretion and did not follow "standardized criteria" in deciding to impound the RV. He reiterated several times throughout his testimony, however, that it was standard practice to impound vehicles under the type of circumstances presented in this case. Deputy Taylor testified that he made the decision to impound the RV based on multiple factors. First, as was common practice, he decided to impound because the driver had been arrested and no other driver was present. Second, he believed the RV posed a liability risk for multiple reasons: another vehicle could have struck the RV, it could have been vandalized, or someone could have broken into the RV if left on the side of the road. Deputy Taylor felt the RV presented "somewhat of a traffic hazard" parked at that location. He described the parked RV as "bottle-necking" the roadway. He considered the fact that at that time of day, traffic was heavier due to people driving home from work. According to Deputy Taylor, many vehicles use that road, and traffic seemed "fairly busy" that day. He was also not comfortable leaving the RV there because it presented a potential opportunity for someone to vandalize or break into the RV. According to him, any time a vehicle is left on the side of the road, locked or not, it is possible someone could break into the vehicle.

According to Deputy Taylor, Defendant stated several times during the traffic stop that she wanted to secure her property. Although not exactly clear, it appears Defendant made these statements after Deputy Taylor decided to impound the RV. It was after he made that decision that Defendant also said she had a lot of money, perishables, and exotic plants inside the RV. In response to Deputy Taylor's question about where she was headed, Defendant said she had been on her way to Arkansas to get birds; Deputy Taylor confirmed there were no birds inside the RV. Ex. B(3), 6:10-6:35. She also explained that her husband was "over the road," which appears to refer to his occupation

10

as an over-the-road truck driver.   Deputy Taylor did not recall whether Defendant said anything about her husband's current location.

It appears from the recordings that it was hot outside at the time during the traffic stop.   Ex. B(1).   Deputy Taylor at one point wiped Defendant's forehead, and Defendant complained of being hot.   Ex. B(1).   Defendant appeared to be agitated but relatively calm at the time she received her *Miranda* warning.   Ex. B(1).   Deputy Taylor described Defendant's demeanor later in the encounter as extremely aggressive, and he stated that she appeared to be concerned he was not properly securing her property.   During a portion of the audio recording from inside Deputy Taylor's patrol vehicle, Defendant sounds upset and uses multiple expletives (apparently to herself). Ex. B(3), 5:35-6:03.   Based on Defendant's demeanor, Deputy Taylor believed it was important to transport her from the scene quickly.[9]   Deputy Taylor transported Defendant to the sheriff's office.   Deputy Schueller stayed with the RV until it was towed at around 5:20 p.m.   The RV was towed to the sheriff's office's secure impound lot.[10]

At the time he stopped Defendant's RV, Deputy Taylor suspected her involvement in criminal activity, based on the historical information as well as the surveillance at her residence the day before.   Deputy Taylor testified that when he stopped Defendant's vehicle, he did not want to search it.   His primary concern was arresting Defendant on the active warrant.   According to him, any concern with the vehicle was secondary.

_____

[9] Because it appears that Defendant's statements and her more excited behavior occurred after Deputy Taylor decided to impound the RV, I find that such factors did not influence his decision to impound but could have affected the manner in which the inventory search occurred.

[10] The lot is not generally accessible to the public, and access is limited to deputies who have openers to enter the lot.

11

### C.      *Available Driver to Move the RV*

Morris, Defendant's husband, is an over-the-road truck driver.   He works full time and is the owner-operator of one truck.    On the day of Defendant's arrest, he had driven back to Spencer.   According to his recollection and his logbook (Exhibit C), around the time of Defendant's traffic stop and arrest, Morris was in Spencer at a truck stop.   As was his habit, Morris stopped there for coffee and to visit when he returned to town.   The truck stop was approximately five miles from the residence he had shared with Defendant since 1990.   Morris had his cell phone with him, and if Defendant had called him, he would have responded to move the RV from the side of the road. According to Morris, the vehicle had proper registration and insurance.   He testified several neighbors would also have been available to move the RV.    There is no indication that Deputies Taylor or Schueller were aware of any of this information when Deputy Taylor decided to impound the RV.

### D.      *Inventory Search of the RV*

Pursuant to policy and general practice, Deputies Taylor and Schueller conducted an inventory search of the RV.   This was done at the secure impound lot the same day as Defendant's arrest.   According to Deputy Taylor, the inventory search was not conducted prior to the tow because Defendant was extremely upset.   On the impound record, Deputy Taylor identified the vehicle but did not include mileage or VIN.   Ex. 2.   It appears that he provided mileage to dispatch by radio while at the scene.   Ex. B(2), 6:10.   Deputy Taylor documented ten items on the impound record:   (1) long life pad; (2) Sirius XM receiver; (3) Craftsman flashlight; (4) CD case with CDs; (5) makeup bag containing makeup; (6) assorted plants; (7) tool box with assorted tools; (8)

12

"Creative" brand speakers; (9) spectrum surround sound; and (10) Sabre OC spray. Deputy Taylor testified that the impound form was not 100% completed. Deputy Taylor also found a pink glasses case inside a Lays bag that contained chips. Inside the glasses case, which he believed could have contained expensive glasses,[11] he found drug paraphernalia (two glass pipes) and marijuana. The deputies also found a scale inside a purse that was between the seats in the front of the RV. The deputies did not search the back half of the RV (described as the living area) because it was inaccessible due to the number of plants in that area. Deputy Taylor testified they were concerned about damaging the plants and risking injury since many of the plants had thorns. Deputy Taylor testified this was consistent with the policy, which directs deputes to stop inventory searches when it is unreasonable to proceed.

Based at least in part on the paraphernalia and scale found during the inventory search, deputies obtained search warrants for the RV and for Defendant's residence. They executed the warrant at Defendant's residence in the early morning hours[12] of September 9, 2016. During that search, they located 69.5 grams of methamphetamine. Four deputies executed the warrant for the RV on September 14, 2016. Deputy Taylor described that search as "much more methodical and invasive" than the inventory search on September 8th. Deputies located 138 grams of methamphetamine inside a locked dictionary box and approximately $9,500 in United States currency inside a locked seat at the rear of the RV.

---

[11] Deputy Taylor based this conclusion on the fact that he owns Oakley-brand glasses, which cost more than $100 per pair.

[12] Deputy Taylor assisted with the execution of the search warrant at the residence. The traffic stop of Defendant's RV was conducted near the end of Deputy Taylor's shift, and he believes he stayed beyond his schedule to assist with the search warrant. This was not unusual as deputies often finish work that was ongoing at the end of their shifts.

13

## IV. DISCUSSION

Defendant asks the court to suppress all evidence obtained on September 8, 2016, during the inventory search of Defendant's vehicle. Doc. 11. Defendant argues that the decision to impound the RV was not made based on law enforcement's community caretaking or public safety functions and that deputies did not follow the sheriff's office's standardized criteria. Doc. 11-1. Defendant argues that the parked RV did not present a hazard, that there was no risk of the RV being stolen or vandalized, that her husband or another person could have come to the scene to remove the RV, and that the deputies suspected Defendant of criminal activity. Doc. 11-1. Defendant argues that Deputy Taylor used improper discretion, rather than following standardized criteria and policies, in deciding to impound the RV and in conducting the inventory search. Defendant argues that the court should suppress evidence seized both during and as a result of the inventory search.

The government resists suppression, arguing the decision to impound the RV was lawful and in accordance with the sheriff's office's policy. The government maintains that Defendant's arrest, as well as the hazards posed from leaving the RV on the side of the road, justified the decision to impound. In support of these arguments, the government points to the fact that Defendant was the sole occupant of the RV, and there is no requirement that deputies provide an arrestee an opportunity to call someone to come to the scene to remove a vehicle. The government argues that because the decision to impound the RV was reasonable, suppression is not required.

The government bears the burden, when it seeks to introduce evidence seized without a search warrant, of establishing that a valid exception to the warrant requirement

14

existed and that law enforcement's actions fell within that exception. *United States v. Marshall*, 986 F.2d 1171, 1173 (8th Cir. 1993).

### A. Lawful Vehicle Impoundment

If properly implemented, a law enforcement agency's practice of impounding vehicles and conducting inventory searches of such vehicles "do not run afoul of the Fourth Amendment's search warrant requirement." *United States v. Arrocha*, 713 F.3d 1159, 1162 (8th Cir. 2013) (citing *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976)). "Impoundment of a vehicle for the safety of the property and the public is a valid 'community caretaking' function of the police." *United States v. Petty*, 367 F.3d 1009, 1011-12 (8th Cir. 2004) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). Impoundment is lawful if the decision to impound is guided by a standard policy and is based on a non-investigatory law enforcement function. *See United States v. Le*, 474 F.3d 511, 514 (8th Cir. 2007) (citing *Colorado v. Bertine*, 479 U.S. 367, 375 (1987)). An officer's testimony "is sufficient to establish the requisite standardized procedures required to comport with the Fourth Amendment[;]" a written policy is not required. *Id.* at 515; *accord United States v. Betterton*, 417 F.3d 826, 830 (8th Cir. 2005). Officers may impound a vehicle when the occupants have been arrested, even if the vehicle is lawfully parked and does not pose a public-safety hazard. *Arrocha*, 713 F.3d at 1163. Officers can also impound a vehicle that "imped[es] traffic or threaten[s] public safety and convenience." *Betterton*, 417 F.3d at 830 (quoting *Opperman*, 428 U.S. at 369).

The Fourth Amendment allows officers to exercise discretion under impound policies in deciding whether to impound a vehicle or leave it parked at the scene, "so long as that discretion is exercised according to standard criteria and on the basis of

something other than suspicion of evidence of criminal activity." *Arrocha*, 713 F.3d at 1162-63 (quoting *Bertine*, 479 U.S. at 375). An officer's exercise of discretion must be guided by "[s]ome degree of 'standardized criteria' or 'established routine' . . . to ensure that impoundments and inventory searches are not merely 'a ruse for general rummaging in order to discover incriminating evidence.'" *Petty*, 367 F.3d at 1012 (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)). Discretion is allowed because it is not possible or realistic for law enforcement agencies to have absolute standards covering every possible situation that may arise. *Id.*

"So long as the officer's residual judgment is exercised based on legitimate concerns related to the purposes of an impoundment, his decision to impound a particular vehicle does not run afoul of the Constitution." *Id.* For instance, a policy that allows officers to determine when a vehicle poses a hazard, a condition for which the policy allows impoundment, is "sufficiently standardized to comport with the Fourth Amendment's reasonableness requirement." *Le*, 474 F.3d at 514. Officers may also exercise discretion "to determine whether a driver is 'available' or a vehicle is 'abandoned'" under a policy that allows officers to impound a vehicle, release it to another driver, or leave it parked at the scene. *Petty*, 367 F.3d at 1011-12. An officer's exercise of discretion does not require suppression when the officer has a valid reason to impound a vehicle, and there is no evidence that the decision to impound was a "ruse for general rummaging" to find evidence, even if the officer has reason to believe the vehicle may contain evidence of a crime. *Arrocha*, 713 F.3d at 1163-64.

"Nothing in the Fourth Amendment requires [officers] to allow an arrested person to arrange for another person to pick up his car to avoid impoundment and inventory." *United States v. Agofsky*, 20 F.3d 866, 873 (8th Cir. 1994) (citing *Bertine*, 479 U.S. at 372). Similarly, even if a registered owner of the vehicle arrives before it is towed from

16

the scene, officers are not required to release the vehicle to the owner. *See United States v. Beal*, 430 F.3d 950, 954 (8th Cir. 2005). This allows officers to avoid disputes over the vehicle's ownership or property contained inside the vehicle. *Id.* "The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means." *Bertine*, 479 U.S. at 373 (quoting *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983)).

### B.   The Decision to Impound Defendant's RV

Defendant argues that Deputy Taylor did not follow standard criteria in deciding to impound Defendant's RV. Defendant bases this argument on Deputy Taylor's acknowledgement that the policy allows for discretion and that he used discretion in implementing the policy. In particular, Defendant points to Deputy Taylor's responses during re-cross-examination of "correct" when counsel said he did not follow standardized criteria. I reach the opposite conclusion. Based on the entirety of Deputy Taylor's testimony, I find that he did follow the standardized criteria outlined in the written impound policy and the standard practices of the sheriff's office. Deputy Taylor was forthright when he testified. He is familiar with the practices of the sheriff's office, which were the same before and after the impound policy was written. I further credit Deputy Taylor's testimony about the policy and practices in light of his years of service with the sheriff's office, his duties as a routine patrol deputy, and the fact that he impounds vehicles several times per week. It was my impression that his testimony about using discretion went to the fact that he would not say that every single vehicle that fell into one of the four categories was impounded. That makes sense, and it is the type of discretion that the law provides for. *See Arrocha*, 713 F.3d at 1163.

17

I find that Deputy Taylor followed the sheriff's office's policy in deciding to impound Defendant's RV. Two conditions that allow for impoundment existed in this case: the driver had been arrested and there was no other available driver, and the RV posed a hazard. Each of these conditions serve legitimate law enforcement functions of community caretaking and providing for public safety. Defendant does not challenge the validity of her arrest. Rather, she argues that Deputy Taylor erred in determining that no other driver was available and that the vehicle posed a hazard. Defendant contends that Deputy Taylor's decision was based solely on an investigatory motive. In determining whether the conditions of the sheriff's office's impoundment policy were met, Deputy Taylor was allowed to exercise discretion based on legitimate concerns related to the purposes of impoundment. *See Arrocha*, 713 F.3d at 1163.

With regard to the availability of another driver, Deputy Taylor acknowledged that he did not provide Defendant an opportunity to contact someone else to come to the scene and take the RV. Nothing in the law required Deputy Taylor to do so. *See Beal*, 430 F.3d at 954; *Agofsky*, 20 F.3d at 873. Deputy Taylor first testified that under the impound policy, when a driver had an active warrant and no one else was available to come to the scene, the vehicle would be towed. He further testified that in practice, another "available" driver meant a driver already on the scene. This appears to be a discrepancy, but for the reasons stated above, I found Deputy Taylor's testimony about the standard practices of the sheriff's office to be credible. Deputy Taylor testified that deputies generally did not allow arrestees to make other arrangements when they were the sole occupant of the vehicle. Furthermore, he testified that based on his experience, it is often impractical to wait for another person to arrive at the scene to retrieve a vehicle. I find that Deputy Taylor acted in conformity with the policy and practices of the sheriff's office in deciding to impound the vehicle due to Defendant's arrest. This includes his

18

decision not to allow Defendant to arrange for another driver to come to the scene. To the extent that the determination of availability of another driver involved the exercise of discretion, I find that Deputy Taylor provided legitimate reasons for not waiting to see if another driver could come to the scene in a reasonable amount of time.

Defendant's arrest was not the sole basis for impoundment in this case; Deputy Taylor also believed the RV posed a hazard. Protecting the safety of other drivers and protecting Defendant's property (both the RV and its contents) are legitimate, non-investigatory functions. Here, Deputy Taylor testified that there was too much liability to the sheriff's office to leave the RV on the side of the road because the RV could have been struck, vandalized, or had items stolen from inside. He acknowledged that Defendant parked the RV as well as possible and that it was completely off the roadway. Nevertheless, his assessment of the risk was reasonable. Especially due to its size, the RV might have distracted drivers or caused them to change lanes unnecessarily. Both occurrences affect public safety. Similarly, even though this was not a high-crime area, Deputy Taylor's concerns of vandalism or someone breaking into the vehicle (perhaps the more likely risk, especially since this was an RV) were valid. That reasoning serves law enforcement's community-caretaker function. Therefore, I find that Deputy Taylor's decision to impound the RV was lawful under the hazard portion of the impound policy.

To support her argument that impoundment was a ruse for deputies to search the RV, Defendant points to the prior day's surveillance, the timing of the Palo Alto arrest warrant, and the timing of her arrest the following day. It appeared from Deputy Taylor's testimony that Deputy Timmer was investigating Defendant's alleged drug distribution. I understand Defendant's concerns with the timing of the issuance of the Palo Alto arrest warrant. It is not clear what time of day the warrant was issued, or

whether deputies conducted surveillance before or after that time. It is likewise unclear what led to the issuance of that warrant, and I decline to speculate on that point. I believed Deputy Taylor's testimony that he was not staking out Defendant's residence the following day when he conducted the traffic stop. I base this on my observations of his testimony, as well as the fact that Defendant's residence and the sheriff's office are on the same road that Deputy Taylor was driving on when he testified he first saw the RV. I also find it likely that had Deputy Taylor wanted only to search for evidence, he and Deputy Schueller would have conducted a thorough and complete inventory search. Deputy Taylor suspected Defendant of being involved in criminal activity, but that is not relevant based on my findings that he followed the sheriff's office's policy and practices and had legitimate, non-investigatory motives for impounding the RV.

### C.    *Lawful Inventory Searches*

Officers may search a lawfully impounded vehicle without a warrant to inventory its contents. *Le*, 474 F.3d at 515 (citing *Opperman*, 428 U.S. at 376). They can do so even if they suspect the vehicle may contain evidence of a crime. *Marshall*, 986 F.2d at 1176. Inventory searches protect vehicles owners' property, and they protect officers and their agencies from claims of lost or stolen property and from potential dangers inside the vehicle. *Beal*, 430 F.3d at 954. To be valid, inventory searches must serve both a legitimate governmental function and "'be conducted pursuant to standard police procedures,'" which means, "standardized criteria or established routine." *Marshall*, 986 F.2d at 1175 (quoting *United States v. Davis*, 882 F.2d 1334, 1339 (8th Cir. 1989)). Conducting inventory searches under standardized police procedures alleviates concerns that officers may search merely to obtain evidence or that they will exercise too much discretion. *Id.* at 1174.

20

Officers must conduct inventory searches in accordance with their agencies' standardized policies, meant to protect the impounded vehicles and their contents. *Betterton*, 417 F.3d at 830. Such policies do not have to "dictate when an officer may open a locked trunk" or container. *United States v. Wallace*, 102 F.3d 346, 349 (8th Cir. 1996). Officers cannot later claim the cover of an inventory search to justify what was clearly a hunt for incriminating evidence. *Beal*, 430 F.3d at 954. Officers are allowed, however, to be alert for potentially incriminating items during a lawful inventory search. *Id.* at 954. "The central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable." *Arrocha*, 713 F.3d at 1164 (quoting *United States v. Frasher*, 632 F.3d 450, 454 (8th Cir. 2011)). Those circumstances include whether the search comported with the law enforcement agency's standardized policy. *Le*, 474 F.3d at 515.

"Even if police fail to adhere to standardized procedures, the search is nevertheless reasonable provided it is not a pretext for an investigatory search. 'Something else' must be present to suggest that the police were engaging in their criminal investigatory function, not their caretaking function, in searching the defendant's vehicle." *United States v. Taylor*, 636 F.3d 461, 465 (8th Cir. 2011) (citations omitted) (quoting *United States v. Rowland*, 341 F.3d 774, 780-81 (8th Cir. 2003)). Police must act in good faith. *See, e.g.*, *Agofsky*, 20 F.3d at 873. Suppression is warranted when a purported inventory search is performed without standardized procedures and "substantial evidence of an investigatory motive" exists. *See Marshall*, 986 F.2d at 1175. Suppression is also warranted when there are no standardized procedures or officers do not follow existing procedures, and the search was a pretext to locate evidence. *See Taylor*, 636 F.3d at 465.

### D.    The Inventory Search of the RV

In this case, Deputies Taylor and Schueller conducted the inventory search.    This was consistent with the sheriff's office's policy to inventory all impounded vehicles and the standard practice of having one to two officers conduct such searches.    The policy appears to be silent on timing and location of inventory searches.    Deputy Taylor testified that inventories are completed at the scene if the vehicle is to be towed to the tow company's lot.    In this case, the inventory was done at the sheriff's office's secure impound lot.    At the scene, the vehicle involved (a midsize RV) was parked on the side of a county road with notable traffic.    Because of Defendant's demeanor, Deputy Taylor felt it was important to transport her from the scene as soon as possible.    This left one deputy at the scene to inventory the RV.    The tow company was taking the RV to the sheriff's office's secure impound lot.    I find that under these circumstances, it was reasonable for deputies to wait to inventory the vehicle at the impound lot.

Deputy Taylor testified that the inventory policy directs deputies to inventory any item that could be worth more than $25.00.    The policy is silent about the search of containers, which does not make the search of containers unlawful.    *See Wallace*, 102 F.3d 349.    There is nothing in this record that shows the deputies failed to follow the policy.    Defense counsel implied something was improper because the government attorney did not receive a copy of the impound record until prior to the hearing.    I find there is no evidence to support any assertion of impropriety.    The deputies completed an inventory form (Exhibit 2), which contains a list of several non-incriminating items of property.    Each of those items appears to have a value of more than $25.00.    It is unclear under what circumstances the deputies decided to look inside a chip bag that contained chips, and Defendant did not raise the issue.    I find the deputies acted reasonably in looking inside Defendant's purse and the glasses case as both items could

22

have likely contained items worth more than $25.00. I credit Deputy Taylor's testimony that they stopped the inventory search because it seemed unreasonable, with the presence of so many plants, to continue the search. Such actions were also in line with the sheriff's office's inventory policy.

For these reasons, I find that the deputies conducted the inventory search within the policy and procedures of the sheriff's office and that the search was reasonable.

## V.    CONCLUSION

For the foregoing reasons, I RESPECTFULLY RECOMMEND that Defendant's motion to suppress (Doc. 11) be **denied**.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. LCrR 59. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the

23

findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **IT IS SO ORDERED** this 10th day of February, 2017.

_____
Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa

Case 5:16-cr-04096-LTS-KEM    Document 24    Filed 02/10/17    Page 24 of 24