# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> ALAUNA GAYE MORRIS, <br><br> Defendant. | No. CR16-4096-LTS <br><br> **ORDER** |

This matter is before me on a Report and Recommendation (R&R) (Doc. No. 24) in which the Honorable Kelly Mahoney, United States Magistrate Judge, recommends that I deny defendant's motion to suppress (Doc. No. 11).

## I. APPLICABLE STANDARDS

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d

793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## II. BACKGROUND

### A. Procedural History

On November 16, 2016, the grand jury returned an indictment (Doc. No. 2) charging Morris with three counts related to the distribution of methamphetamine. The defendant filed his motion to suppress on December 16, 2016. The Government filed a resistance (Doc. No. 12) on December 22, 2016. Judge Mahoney conducted a hearing on January 17, 2017, and issued her R&R (Doc. No. 24) on February 10, 2017. Morris filed a timely objection (Doc. Nos. 25, 30), which the Government resisted (Doc. No. 31).

### B. Relevant Facts

Judge Mahoney made detailed factual findings. Doc. No. 24 at 4-12. The parties have not specifically objected to any portion of Judge Mahoney's findings. Doc. No. 25.

2

Based on my de novo review, which included reviewing the transcript of the hearing, Government Exhibit 2 and defendant's Exhibits A through C, I find Judge Mahoney's findings to be accurate.

In short, this case involves a vehicle stop and impound search. Local law enforcement in Clay County, Iowa, received a tip that Morris was engaged in the distribution of methamphetamine. Clay County sheriff's deputies began surveilling her. On September 7, 2016, an unrelated warrant was issued for Morris' arrest in Palo Alto County, Iowa. Clay County deputies learned of the warrant the next day. Later that day, Clay County Deputy Spencer Taylor, who knew Morris from past experience, drove by her rural residence and saw a recreational vehicle (RV) leaving her driveway. Taylor ran the plates, learned the RV was registered to Morris and stopped the vehicle. The stop occurred on a country black-top road. Taylor had Morris exit the vehicle and arrested her pursuant to the arrest warrant. Shortly thereafter, Taylor requested a tow to impound the RV. The longer Morris was in custody, the more agitated she became. Taylor took Morris to the Sheriff's office while another officer, Deputy Schueller, stayed with the RV.

The main issue in this case is the vehicle impound. As Judge Mahoney explained:

> The impound record listed the "reason for impoundment" as "arrest." Ex. 2. Deputy Taylor acknowledged he could have exercised discretion and allowed Defendant, as she requested, to secure the vehicle rather than having it towed. He did not do so. Deputy Taylor testified that his decision to impound the RV was within the policy and practice of the sheriff's office. During re-cross-examination, Deputy Taylor answered "correct" to defense counsel's repeated questions that Deputy Taylor exercised discretion and did not follow "standardized criteria" in deciding to impound the RV. He reiterated several times throughout his testimony, however, that it was standard practice to impound vehicles under the type of circumstances presented in this case. Deputy Taylor testified that he made the decision to impound the RV based on multiple factors. First, as was common practice, he decided to impound because the driver had been arrested and no other driver was present. Second, he believed the RV posed a liability risk for multiple reasons: another vehicle could have struck the

3

RV, it could have been vandalized, or someone could have broken into the RV if left on the side of the road. Deputy Taylor felt the RV presented "somewhat of a traffic hazard" parked at that location. He described the parked RV as "bottle-necking" the roadway. He considered the fact that at that time of day, traffic was heavier due to people driving home from work. According to Deputy Taylor, many vehicles use that road, and traffic seemed "fairly busy" that day. He was also not comfortable leaving the RV there because it presented a potential opportunity for someone to vandalize or break into the RV. According to him, any time a vehicle is left on the side of the road, locked or not, it is possible someone could break into the vehicle.

According to Deputy Taylor, Defendant stated several times during the traffic stop that she wanted to secure her property.

Doc. No. 24 at 9-10.

Clay County's impound policy was not admitted into evidence. Judge Mahoney summarized Taylor's testimony about the policy as follows:

The sheriff's office issued a written impound policy on August 1, 2015. According to Deputy Taylor, that policy was a written adaptation of the unwritten practices used by the sheriff's office prior to that time. The written policy provided four instances when a deputy may impound a vehicle: the vehicle was abandoned; the vehicle had been involved in an accident; the vehicle's driver had been arrested; or the vehicle posed a hazard. The policy and practice for the sheriff's office was to tow vehicles when they posed a hazard or when the sole occupant had been arrested. Deputy Taylor testified that the impound policy was also consistent with the goal of preventing liability for the sheriff's office. Liability could arise if a vehicle that deputies did not impound were to be struck, vandalized, or broken into.

In regard to the driver's arrest provision of the policy, deputies are allowed to release the vehicle, rather than have it impounded, if there is a licensed driver available, and the vehicle was properly registered and insured. It is unclear from the record what, if anything, the policy says about what constitutes an "available" driver. Deputy Taylor testified that in practice, "available" means the licensed driver was present at the scene. . . On cross-examination, Deputy Taylor agreed with defense counsel that "at the scene" was not in the written policy. Deputy Taylor testified that it

4

> was not standard practice to allow arrestees to contact someone to respond to the scene to drive the vehicle. Based on his experience, arrestees often lied and said a driver could respond to the scene quickly, and then deputies ended up waiting for a long period before the other driver actually arrived. Deputy Taylor said that in his experience, arrestees did this because they preferred not having their vehicles towed and impounded. He testified that deputies avoid trying to wait long periods for another driver to arrive and move the vehicle. Deputies do not tow every vehicle that falls under one of the policy's four categories. Deputy Taylor testified that they could exercise discretion under the policy.

*Id*. at 4-5. The evidence indicates that there were several individuals who could have picked up Morris' RV, although none were at the scene and it is unclear how much information about these individuals was communicated to the deputies.

As for why Taylor chose to impound the RV instead of leaving it, Judge Mahoney summarized his testimony as follows:

> It appears the policy allows deputies to exercise discretion in deciding whether a vehicle was abandoned or posed a hazard, and whether another driver was available. According to Deputy Taylor, whether a vehicle was impounded "depends on the circumstances." For instance, when the driver is arrested for driving offenses (such as driving while barred), the vehicle will "almost assuredly" be impounded. As another example, vehicles involved in accidents would usually be towed, although Deputy Taylor could not say definitively that this happened every time. He testified that "more often than not" in circumstances in which the driver was arrested and there were property concerns (the type of circumstances present in this case), the vehicle was impounded. Deputy Taylor testified that "by more often than not," he meant there were "outliers" when a vehicle in those circumstances would not be impounded. There are situations when vehicles that could be impounded are left on the side of the road. Deputy Taylor reiterated that the policy provided for impounding vehicles when the driver was arrested or the vehicle posed a hazard.

*Id*. at 5-6. Once the vehicle is secured, Taylor stated that, "deputies are required to inventory items that could be valued at more than $25.00. These items are recorded on an impound report that contains a description of the vehicle, the operator, the owner, the

5

reason for the tow, the towing service, and a list of items inventoried." *Id*. at 6. However:

> It is not clear what the policy says, if anything, about when and where the inventory search is to occur. Deputy Taylor testified that it is standard for deputies to inventory vehicles prior to impound. They always do so if the vehicle was to be towed to the tow service's lot rather than the sheriff's office secure impound lot. According to Deputy Taylor, one or two deputies generally conducted inventory searches. The policy directed deputies to stop the search if it was unreasonable to proceed. Nothing in the policy addressed searching inside containers. The practice, according to Deputy Taylor, was to look inside a container if it might contain something worth more than $25.00.

*Id*.

Taylor and Schueller ultimately conducted the inventory search of the RV after the vehicle reached the impound lot. However, a large portion of the RV was inaccessible because Morris was using the RV to transport large potted plants. In the portion of the vehicle that the officers could access, they found drug paraphernalia in a sunglasses case and a purse. The officers sought and were granted a search warrant for the RV and Morris' residence. During the exclusion of that warrant, the officers found a large quantity of methamphetamine at the residence (69.5 grams) and even more methamphetamine (138 grams) hidden in the RV. They also discovered a substantial amount of currency hidden in the RV.

### C. *Judge Mahoney's Findings*

Regarding the vehicle impound, Judge Mahoney applied the appropriate standard, which will be discussed in detail below, and concluded as follows:

> Based on the entirety of Deputy Taylor's testimony, I find that he did follow the standardized criteria outlined in the written impound policy and the standard practices of the sheriff's office. Deputy Taylor was forthright when he testified. He is familiar with the practices of the sheriff's office, which were the same before and after the impound policy was written. I

6

further credit Deputy Taylor's testimony about the policy and practices in light of his years of service with the sheriff's office, his duties as a routine patrol deputy, and the fact that he impounds vehicles several times per week. It was my impression that his testimony about using discretion went to the fact that he would not say that every single vehicle that fell into one of the four categories was impounded. That makes sense, and it is the type of discretion that the law provides for. *See Arrocha*, 713 F.3d at 1163.

I find that Deputy Taylor followed the sheriff's office's policy in deciding to impound Defendant's RV. Two conditions that allow for impoundment existed in this case: the driver had been arrested and there was no other available driver, and the RV posed a hazard. Each of these conditions serve legitimate law enforcement functions of community caretaking and providing for public safety. Defendant does not challenge the validity of her arrest. Rather, she argues that Deputy Taylor erred in determining that no other driver was available and that the vehicle posed a hazard. Defendant contends that Deputy Taylor's decision was based solely on an investigatory motive. In determining whether the conditions of the sheriff's office's impoundment policy were met, Deputy Taylor was allowed to exercise discretion based on legitimate concerns related to the purposes of impoundment. *See Arrocha*, 713 F.3d at 1163.

With regard to the availability of another driver, Deputy Taylor acknowledged that he did not provide Defendant an opportunity to contact someone else to come to the scene and take the RV. Nothing in the law required Deputy Taylor to do so. . . I find that Deputy Taylor provided legitimate reasons for not waiting to see if another driver could come to the scene in a reasonable amount of time.

Doc. No. 24 at 17-19. Judge Mahoney also found:

Deputy Taylor also believed the RV posed a hazard. Protecting the safety of other drivers and protecting Defendant's property (both the RV and its contents) are legitimate, noninvestigatory functions. Here, Deputy Taylor testified that there was too much liability to the sheriff's office to leave the RV on the side of the road because the RV could have been struck, vandalized, or had items stolen from inside. He acknowledged that Defendant parked the RV as well as possible and that it was completely off the roadway. Nevertheless, his assessment of the risk was reasonable. Especially due to its size, the RV might have distracted drivers or caused

7

> them to change lanes unnecessarily. Both occurrences affect public safety. Similarly, even though this was not a high-crime area, Deputy Taylor's concerns of vandalism or someone breaking into the vehicle (perhaps the more likely risk, especially since this was an RV) were valid. That reasoning serves law enforcement's community-caretaker function. Therefore, I find that Deputy Taylor's decision to impound the RV was lawful under the hazard portion of the impound policy.

*Id.* at 19. Judge Mahoney specifically addressed, and rejected, Morris' allegation that the impound was pretextual. *Id.* at 20.

> Judge Mahoney then considered timing and location of the search:
>
> Deputies Taylor and Schueller conducted the inventory search. This was consistent with the sheriff's office's policy to inventory all impounded vehicles and the standard practice of having one to two officers conduct such searches. The policy appears to be silent on timing and location of inventory searches. Deputy Taylor testified that inventories are completed at the scene if the vehicle is to be towed to the tow company's lot. In this case, the inventory was done at the sheriff's office's secure impound lot. At the scene, the vehicle involved (a midsize RV) was parked on the side of a county road with notable traffic. Because of Defendant's demeanor, Deputy Taylor felt it was important to transport her from the scene as soon as possible. This left one deputy at the scene to inventory the RV. The tow company was taking the RV to the sheriff's office's secure impound lot. I find that under these circumstances, it was reasonable for deputies to wait to inventory the vehicle at the impound lot.

*Id.* at 22. Judge Mahoney likewise found the inventory search constitutional:

> Deputy Taylor testified that the inventory policy directs deputies to inventory any item that could be worth more than $25.00. The policy is silent about the search of containers, which does not make the search of containers unlawful. *See Wallace*, 102 F.3d 349. There is nothing in this record that shows the deputies failed to follow the policy. Defense counsel implied something was improper because the government attorney did not receive a copy of the impound record until prior to the hearing. I find there is no evidence to support any assertion of impropriety. . . I find the deputies acted reasonably in looking inside Defendant's purse and the glasses case as both items could have likely contained items worth more than $25.00. I credit Deputy Taylor's testimony that they stopped the inventory search

8

> because it seemed unreasonable, with the presence of so many plants, to continue the search. Such actions were also in line with the sheriff's office's inventory policy.
>
> For these reasons, I find that the deputies conducted the inventory search within the policy and procedures of the sheriff's office and that the search was reasonable.

*Id.*, at 22-23.

### III.  DISCUSSION

In her objection, Morris raises three arguments. First, that Taylor did not follow standardized criteria in impounding the RV. Second, that the RV was not impounded for a legitimate caretaking purpose. Third, that there was no policy regarding the opening of containers. Because the first two arguments relate to the impound, I will address them jointly before addressing the inventory search.

#### A.  *The Impound*

##### 1.  *Standard*

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend IV. "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). However, law enforcement may search a lawfully impounded vehicle to compile an inventory of the vehicle's contents. *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976). The Government has the burden of demonstrating that this exception applies.

In *Colorado v. Bertine*, 479 U.S. 367 (1987), the Supreme Court discussed the reasons for, and limits of, this exception. The Court explained that "inventory procedures serve to protect an owner's property while it is in the custody of the police,

to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Id.* at 372. The Court distinguished "police caretaking procedures" from criminal investigations, finding that the policies behind the probable cause and warrant requirements that apply during investigations "are not implicated in an inventory search." *Id.* at 371. The Court recognized that allowing law enforcement to exercise unfettered discretion in deciding whether or not to impound and inventory a vehicle could blur this distinction and allow the "caretaking" function to serve as a ruse for warrantless investigative searches. Thus, the Court made it clear that law enforcement's discretion must be "exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Id.* at 375. Because the officers in *Bertine* acted pursuant to "standardized procedures," the Court held that evidence gathered during an inventory search of the defendant's vehicle should not have been suppressed. *Id.* at 375-76.

Under *Bertine*, then, "[t]he impounding of a vehicle passes constitutional muster so long as the decision to impound is guided by a standard policy—even a policy that provides officers with discretion as to the proper course of action to take—and the decision is made 'on the basis of something other than suspicion of evidence of criminal activity.'" *United States v. Kimhong Thi Le*, 474 F.3d 511, 514 (8th Cir. 2007) (quoting *Bertine*, 479 U.S. at 375). Moreover, "as long as impoundment pursuant to the community caretaking [or public safety] function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking [or public safety] motives will not invalidate the search." *United States v. Wallace*, 102 F.3d 346, 348 (8th Cir. 1996) (citing *United States v. Marshall*, 986 F.2d 1171, 1175-76 (8th Cir. 1993)).

The circuit courts of appeal differ on whether, and to what extent, law enforcement must rely on standard criteria in deciding whether to impound a vehicle pursuant to *Bertine*. *Compare United States v. McKinnon*, 681 F.3d 203, 208 (5th Cir. 2012) (the inquiry should be focused on "the reasonableness of the vehicle impoundment for a

community caretaking purpose without reference to any standardized criteria"); *United States v. Coccia*, 446 F.3d 233, 238 (1st Cir. 2006) (the absence of standardized criteria does not necessarily invalidate the impoundment as long as the impoundment was reasonable under the circumstances); *United States v. Smith*, 522 F.3d 305, 312 (3d Cir. 2008) (the adoption of a standardized impoundment procedure "merely supplies a methodology by which reasonableness can be judged and tends to ensure that the police will not make arbitrary decisions in determining which vehicles to impound" and that a decision to impound a vehicle without a standardized procedure is not a *per se* constitutional violation); *United States v. Duguay*, 93 F.3d 346, 351 (7th Cir. 1996) ("'[S]tandardized criteria or established routine must regulate' inventory searches. Among those criteria which must be standardized are the circumstances in which a car may be impounded.") (internal citation omitted); *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013) ("[d]iscretion as to impoundment is permissible so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity"); *Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992) ("Even if an arrestee's vehicle is not impeding traffic or otherwise presenting a hazard, a law enforcement officer may impound the vehicle, so long as the decision to impound is made on the basis of standard criteria and on the basis of 'something other than suspicion of criminal activity.'"). The Eighth Circuit has explained its interpretation of *Bertine* as follows:

> Some degree of "standardized criteria" or "established routine" must regulate these police actions, which may be conducted without the safeguards of a warrant or probable cause, to ensure that impoundments and inventory searches are not merely a ruse for general rummaging in order to discover incriminating evidence.
>
> The requirement that discretion be fettered, however, has never meant that a decision to impound must be made in a "totally mechanical" fashion. . . It is not feasible for a police department to develop a policy that provides clear-cut guidance in every potential impoundment situation.... [T]estimony can be sufficient to establish police [impoundment] procedures. . . So long

11

> as the officer's residual judgment is exercised based on legitimate concerns related to the purposes of an impoundment, his decision to impound a particular vehicle does not run afoul of the Constitution.

*United States v. Arrocha*, 713 F.3d 1159, 1163 (8th Cir. 2013) (quoting *Petty*, 367 F.3d at 1012).

This standard is illustrated in *Petty*, in which the court found that a policy was sufficiently "standardized" when it provided that a vehicle could be towed when it was abandoned or no one was available to drive it. 367 F.3d at 1012. The court noted that the officer had to exercise some discretion in determining whether the driver was "available" or the vehicle was "abandoned." *Id*. As long as the officer's "residual judgment" or discretion was exercised based on legitimate concerns related to the purposes of an impoundment, it was sufficient. *Id*. In *Petty*, the driver had been arrested, his female companion wanted nothing to do with the car, the car was a rental and it was left unattended at 1:30 a.m. in a business parking lot in an area known for narcotics and prostitution. *Id*. The court found that the police were appropriately concerned with protecting the property of the rental company from damage or theft and "[i]t was not unreasonable for the police, having just arrested the party who leased the vehicle, to feel that they were responsible for safeguarding the car until it could be retrieved by the owner." *Id*. at 1013.

In short, for impoundment to be reasonable under Supreme Court and Eighth Circuit precedent, discretionary decisions to impound a vehicle must be guided by some degree of standardized criteria unless the reason for impoundment falls clearly within law enforcement's community caretaking or public safety functions. In exercising his or her discretion within those standardized criteria, the officer's decision to impound must be based on legitimate concerns related to the purposes of an impoundment. This "ensure[s] that impoundments and inventory searches are not merely a ruse for general rummaging in order to discover incriminating evidence." *Arrocha*, 713 F.3d at 1163.

*2. Discussion*

Judge Mahoney found that the Clay County Sheriff's Department has a policy that a vehicle may be impounded when the vehicle's driver is arrested or the vehicle would pose a hazard, and that defendant's vehicle was properly impounded pursuant to that policy. As discussed above, law enforcement may impound a vehicle for reasons related to community caretaking or public safety. *See Opperman*, 428 U.S. at 368 ("The authority of police to seize and remove from the streets vehicles impeding traffic or threating public safety and convenience is beyond challenge."). Other reasonable circumstances for impounding a vehicle include when the driver has been arrested, when the driver's license has been suspended, when no one is available to drive the vehicle or when there is a risk of theft or vandalism. *See Arrocha*, 713 F.3d at 1163 ("Police may take protective custody of a vehicle when they have arrested its occupants, even if it is lawfully parked and poses no public safety hazard."); *United States v. Betterton*, 417 F.3d 826, 830 (8th Cir. 2005) (finding impoundment reasonable where car was stopped in a traffic lane in a no-parking zone and defendant could not drive the car because his license was suspended); *United States v. Garner*, 181 F.3d 988, 992 (8th Cir. 1999) (finding impoundment reasonable where vehicle was parked in no-parking zone on a busy street, was worth more than $15,000 and was in a high-crime area); *Petty*, 367 F.3d at 1012 (impoundment reasonable when passenger refused to drive vehicle after driver was arrested); *United States v. Harris*, 795 F.3d 820, 822 (8th Cir. 2015) (impound policy that provides a vehicle may be impounded when the driver is arrested and the vehicle would be left on a roadway is constitutionally sufficient.)

In her objection, Morris argues that Taylor did not follow a standardized policy and that, even if he did, defendant's vehicle did not, as a matter of fact, pose a safety hazard. At the outset, Morris is correct in that the Clay County officers involved in defendant's arrest were not fluent in the exact wording of their department's written impound policy. As noted by both Morris and Judge Mahoney, Taylor relied on the

written policy while testifying in court. Taylor admitted that he had not been trained on the written impound policy but understood the written impound policy to be a codification of the prior unwritten policy. Doc. No. 26 at 22-23. He admitted that he did not independently recall the four instances when deputies were allowed to impound a vehicle pursuant to the policy. *Id*. at 24. Taylor also acknowledged that allowing another licensed driver to pick up the vehicle was within his discretion under the policy. *Id*. at 41. However, Morris cites no law or standard that requires officers to memorize their department's impound policy verbatim. Instead, the applicable standards require that a policy exist, that the officers followed the policy, and that the search not be a pretext for "rummaging" for evidence.

Regarding his department's policy, Taylor was unwavering that he knew that the arrest of the vehicle driver and existence of a roadside hazard were two instances in which the policy allows officers to impound a vehicle. When asked about the policy, Taylor stated:

> The practice is if there's not another person there with a valid driver's license to remove the vehicle from the scene, there's too much liability for our office to just allow it to be left on the side of the road or potentially be struck or vandalized or have thefts occur out of. So typically in the exact situation that we were in, we would call for a tow truck to remove that vehicle from the scene and take it back to our secured impound lot at the Clay County Sheriff's Office.

Doc. No. 26 at 9-10. Taylor also stated that there is a procedure for towing a vehicle, which includes calling a tow company if the vehicle poses a hazard or if the driver is arrested *Id*. at 12, 14. Taylor testified that Morris was arrested and he believed the vehicle to be a potential hazard. *Id*. at 37-39, 40.

Even though the written policy was not admitted into evidence, no real argument was made that Taylor fabricated his statements regarding that policy. Judge Mahoney found him credible on the topic of the policy, as do I. Accordingly, because there is no real dispute that the Clay County Sheriff's Department had an impound policy and that

14

policy authorized impound in the facts of this case, Judge Mahoney's recommendation is clearly correct.

In her objection, Morris highlights the fact that Taylor quickly decided to impound the vehicle after making the traffic stop and arrest. Defendant cites *United States v. Bridges*, 245 F. Supp. 2d 1034 (S.D. Iowa 2003), in which the court stated that an officer's instantaneous decision to impound a vehicle gives rise to "a suggestion that the impoundment was done primarily in order to perform the inventory." *Id.* at 1037. It is unclear as to whether this is a correct statement of Eighth Circuit precedent, as the court cited no supporting case law and I have found none. Regardless, the facts in *Bridges* are radically different from those here. In *Bridges*, officers stopped a vehicle in a gas station parking lot for a traffic violation. Their department had a similar impound policy as in this case, allowing officers to impound due to hazards or in the case of arrest. Bridges was driving the car, and the police officers issued him a citation for driving without a license. However, he was not arrested or taken into custody. The officers then decided to impound the vehicle. Based on those facts, the court found the officers did not follow the applicable policy because the vehicle was not a hazard, as it was parked in a parking lot, and the driver was not arrested. Here, by contrast, Morris was driving a large RV, the vehicle was stopped on a public roadway and she was taken into custody. Nothing about the holding in *Bridges* supports Morris' argument that the impound of her RV was improper.

Morris also argues that Taylor did not explore other options for dealing with the vehicle and that the vehicle was not, in fact, a hazard. Neither argument is persuasive. Courts have repeatedly approved impound policies that give officers some amount of discretion. For instance in *Kimhong Thi Le*, cited above, an officer, acting pursuant to policy that allowed for the impoundment of a vehicle that the officer determined to be a hazard, impounded a vehicle that was overturned in a ditch forty feet away from the roadway. The officer reasoned that in poor weather the vehicle may attract others to stop

15

and investigate, thus posing a hazard. The Eighth Circuit held that so long as the officer's "judgment is exercised based on legitimate concerns related to the purposes of an impoundment, his decision to impound a particular vehicle does not run afoul of the Constitution." *Kimhong Thi Le*, 474 F.3d at 514 (internal citations omitted).

The evidence here demonstrates that this situation involved a relatively large RV parked on the side of a rural roadway. Common sense dictates that even though the RV was pulled onto the shoulder of the roadway, it still could pose a hazard by, for example, blocking visibility or impeding wide-bodied vehicles that may be traveling on the road. Because of the possible hazards, Taylor acted on legitimate concerns in impounding the vehicle. While Taylor had discretion under his department's policy to allow another civilian take custody of the vehicle, there is no indication that he had a legal obligation to do so. Given the fact that Morris was arrested alone in a rural area, Taylor's decision to use his discretion to impound the vehicle was legitimate and reasonable.

Finally, Morris makes much of the fact that Taylor testified he was not particularly interested in the contents of the RV. Morris states that this testimony is "plain absurd" and implies that Taylor wanted to inventory the RV. Doc. No. 30 at 6. However, even if an officer is interested in the contents of an impounded vehicle, that interest is not relevant so long as the officer followed standardized criteria or towed the vehicle for a legitimate community caretaking purpose. *See Petty*, 367 F.3d at 1013 ("That an officer suspects he might uncover evidence in a vehicle, however, does not preclude the police from towing a vehicle and inventorying the contents, as long as the impoundment is otherwise valid."). In this case, as noted above, Taylor was well within his department's policy to impound the vehicle for legitimate non-investigatory reasons. Accordingly, whether or not Taylor had any interest in the RV's contents is a moot issue.

Based on my de novo review, I agree with the Judge Mahoney that Morris' motion to suppress based on an allegedly-improper impound must be denied.

### B. Inventory Search

Next, Morris argues that the inventory search was not conducted in a constitutional manner.

#### 1. Standard

Judge Reade has aptly summarized the appropriate standard for evaluating an inventory search:

> A well-established exception to the Fourth Amendment's warrant requirement is the so-called inventory search exception. "Law enforcement officers may conduct a warrantless search when taking custody of a vehicle to inventory the vehicle's contents 'in order to protect the owner's property, to protect the police against claims of lost or stolen property, and to protect the police from potential danger.'" *United States v. Ball*, 804 F.3d 1238, 1240-41 (8th Cir. 2015) (quoting *United States v. Hartje*, 251 F.3d 771, 775 (8th Cir. 2001)). However, "[o]fficers 'may not raise the inventory-search banner in an after-the-fact attempt to justify what was … purely and simply a search for incriminating evidence ….'" *Id*. at 1241 (quoting *United States v. Beal*, 430 F.3d 950, 954 (8th Cir. 2005)). In conducting the inventory search, officers need not turn a blind eye toward "potentially incriminating items that they might discover in the course of an inventory search, as long as their sole purpose is not to investigate a crime." *Id*. (quoting *Beal*, 430 F.3d at 954). An inventory search must still comport with the Fourth Amendment's demand of reasonableness. *Id*. "The reasonableness requirement is met when an inventory search is conducted according to standardized police procedures, which generally remove the inference that the police have used inventory searches as a purposeful and general means of discovering evidence of a crime." *United States v. Smith*, 715 F.3d 1110, 1117 (8th Cir. 2013) (quoting *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011)). Even when officers fail to strictly follow standardized procedure, suppression is not warranted unless there is "something else" that suggests that the inventory search was merely an illegitimate attempt to conduct a search for incriminating evidence. *Id*. at 1117-18 (quoting *United States v. Rowland*, 341 F.3d 774, 780 (8th Cir. 2003)).

*United States v. Perez-Trevino*, No. 15-CR-2037-LRR, 2016 WL 2752386, at *3 (N.D. Iowa May 10, 2016).

### *2. Discussion*

Morris argues that the Clay County Sheriff's Department did not have a valid inventory search policy because the policy did not specifically contemplate the search of closed containers within the vehicle. Judge Mahoney found that search was a constitutional inventory search because the officers followed their department's policy. Regarding the closed container issue, Judge Mahoney found the lack of specifics in the policy regarding closed containers was not fatal. Doc. No. 24 at 21-23.

In support of her argument, Morris cites *Florida v. Wells*, 495 U.S. 1, 4 (1990), in which the Supreme Court held that when conducting a vehicle inventory search, the opening of containers within in the vehicle must be done pursuant to either a written policy or an established routine. Morris argues that Taylor opened containers in a haphazard manner and that his actions did not comport with any department policy. Morris argues that the inventory search and the opening of closed containers was done primarily to "rummage" for evidence.

> *Kimhong Thi Le*, discussed above, addressed this issue as follows:
>
> Trooper Vance's search of the SUV, including opening the duffle bags containing the marijuana, was consistent with North Dakota Highway Patrol policy to "conduct a detailed inspection and inventory of all impounded vehicles." Trooper Vance testified that he was trained to open closed containers during inventory searches and that it is his standard practice to do so. Such oral testimony is sufficient to establish the requisite standardized procedures required to comport with the Fourth Amendment. *See United States v. Low*e, 9 F.3d 43, 46 (8th Cir.1993) (holding that evidence of a written policy is not required and that oral testimony about a standard policy to open closed containers during an inventory search is sufficient to meet the Fourth Amendment's reasonableness requirement). Thus, the search did not run afoul of the Constitution.

*Kimhong Thi Le*, 474 F.3d at 515. Here, Taylor testified that the department's policy is to have deputies conduct an inventory search of all impounded vehicles and to look for all items that exceeded $25.00 in value. *Id*. at 15-16. He stated that the policy requires that the search be discontinued if it became unreasonable to proceed. *Id*. at 18. He acknowledged that the policy does not specifically address looking in enclosed containers. *Id*. at 48. However, he stated because the policy requires officers to look for valuables worth more than $25.00: "My understanding is that if something of value could reasonably be inside [a container], you know, that's something that needs to be inventoried." *Id*. at 49. As such, he stated: "That's practice, yes." *Id*.

Under *Kimhong Thi Le*, an unwritten practice of searching closed containers is sufficient to survive a constitutional challenge. Based on Taylor's testimony, which I find to be credible, I find that the policy of the Clay County Sheriff's Department is to conduct an inventory search of all impounded vehicles and to look for all items that exceeded $25.00 in value. I further find that pursuant to this policy, the standard practice is to search any containers that can hold items worth more than $25.00 value. Taylor's search comported with that practice. Accordingly, based on my de novo review of the record in this case, I agree with Judge Mahoney that Morris' motion to suppress based on an allegedly-improper inventory search must be denied.[1]

---

[1] As noted above – and emphasized by the Government (*See* Doc. No. 31 at 18) – even if a search does not comply with a standard procedure, some evidence must suggest the search was pretextual before the evidence will be suppressed. *See, e.g., Taylor*, 636 F.3d at 465. Because I find that Taylor's search complied with a standard procedure, I need not reach the issue of whether "something else" suggested an investigatory search. However, I note Morris has pointed to numerous facts indicating an investigatory motive for the search, including (1) the fact that the deputies had received a tip regarding Morris' alleged drug distribution, (2) the deputies were investigating Morris prior to her arrest, (3) Taylor stayed on duty long after the end of his shift to conduct the inventory search and (4) deputies sought a search warrant and abandoned the inventory search as soon as they discovered drug paraphernalia. These facts, in combination,

## IV. CONCLUSION

1. For the reasons set forth herein, I **adopt** the Report and Recommendation (Doc. No. 24) in which Judge Mahoney recommends that I deny defendant's motion to suppress evidence.

2. Defendant's objection (Doc. No. 25) to the Report and Recommendation is **overruled**.

3. Defendant's motion to suppress (Doc. No. 11) is **denied**.

**IT IS SO ORDERED.**

**DATED** this 15th day of August, 2017.

_____
Leonard T. Strand, Chief Judge

---

suggest that Taylor may have had an investigatory interest in conducting the inventory search. Absent my finding that the department's standard practice provided for the container search, these facts would support suppression of the evidence at issue.